# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| LEON LEVESQUE,            ) | |
|              ) | |
|         PLAINTIFF    ) | |
|              ) | |
| v.                           ) | CIVIL NO. 07-112-P-H |
|              ) | |
| STEVE DOOCY, ET AL.,    ) | |
|              ) | |
|      DEFENDANTS    ) | |

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The facts in this case—a morning cable news show derisively reporting events and statements obtained unwittingly from an online parody—should provide grist for journalism classes teaching research and professionalism standards in the Internet age. But First Amendment principles developed long before the Internet still provide protection to the gullible news program hosts against this public official's claims for defamation and false light invasion of privacy.  Poetic justice would subject the defendants to the same ridicule that they accorded the plaintiff. But in real life, the aggrieved school superintendent must be satisfied with their later retraction and a professional reputation sullied less than theirs. The defendants' motion for summary judgment is **GRANTED**.

### FACTS AND PROCEDURAL HISTORY[1]

The dispute between the parties arises from the Fox News Channel's coverage of an incident that occurred at the Lewiston Middle School in Lewiston, Maine.  On April 11, 2007, a middle school student placed a bag containing ham on a table where Somali students were eating lunch.[2]  The student reportedly was acting on a dare; he and his friends thought it would be a funny joke.[3]  The Somali students, who were Muslims, were very upset by the incident.[4]  They informed the lunchroom monitor, and the lunchroom monitor alerted William Brochu, the school resource officer from the Lewiston Police Department.[5]  Officer Brochu directed all the students involved in the incident to report to the assistant principal's office.[6]  There, the assistant principal and the principal met with the students and ultimately suspended the culprit for ten school days.[7]

---

[1] Citations to the record throughout this section point to both the defendants' and the plaintiff's statements to indicate agreement on a particular fact; a citation pointing only to the plaintiff's statements reflects the summary judgment mandate to view the facts in the light most favorable to the nonmoving party (in this case, the plaintiff).  The parties have filed some materials, including depositions, under seal, as subject to a confidentiality order to which they agreed. At my request the Clerk's office inquired whether my citation to deposition transcripts would invade any confidentiality and they replied no. Any other citations to materials that are sealed do not infringe any legitimate confidentiality.

[2] Defs.' Statement of Material Facts ("SMF") (Redacted) ¶17 (Docket Item 40); Pl.'s Response Statement of Material Facts ("Resp. SMF") (Redacted) ¶ 17 (Docket Item 58).

[3] Defs.' SMF ¶¶ 17, 29; Pl.'s Resp. SMF ¶¶ 17, 29.

[4] Defs.' SMF ¶¶ 26-28; Pl.'s Resp. SMF ¶¶ 26-28.  One student reported that he believed he would not go to heaven because he had been placed in close proximity to pork.  Defs.' SMF ¶ 27; Pl.'s Resp. SMF ¶ 27.  Another student said the cafeteria incident reminded him of a previous incident, in which a Lewiston man rolled a pig's head into a local mosque.  Defs.' SMF ¶ 28; Pl.'s Resp. SMF ¶ 28.

[5] Defs.' SMF ¶ 21; Pl.'s Resp. SMF ¶ 21.

[6] Defs.' SMF ¶ 22; Pl.'s Resp. SMF ¶ 22.

[7] Defs.' SMF ¶¶ 23, 30; Pl.'s Resp. SMF ¶¶ 23, 30.

Later that day, following directions from a superior officer, Officer Brochu filed a police report describing the cafeteria incident.[8]  The Police Department then referred the report to the Office of the Maine Attorney General for further investigation.[9]  The police report classified the incident as "Crime: Harassment/ Hate Bias."[10]

The plaintiff, Leon Levesque, is the superintendent of the Lewiston School Department.[11]  On the day that the incident occurred, the middle school principal informed Levesque that the student had been suspended.[12]  A week later, Bonnie Washuk, a reporter for the local newspaper, the Lewiston Sun Journal, contacted Levesque in connection with an article that she intended to write about the incident.[13]  The article ran in the Lewiston Sun Journal on April 19, 2007, and included quotations from Levesque regarding the incident.[14]  For example, the Washuk article reported that Levesque said that the incident was being treated seriously as "a hate incident" and that "[w]e've got some work to do to turn this around and bring the school community back together again[.]"  Washuk cited Levesque as saying that the incident did not reflect the moral values of the school staff and students and that "[w]e need to take a look at this and review how a careless act is degrading and causes hurt to other people.  All our students should

---

[8] Defs.' SMF ¶¶ 34-35; Pl.'s Resp. SMF ¶¶ 34-35.
[9] Defs.' SMF ¶ 38; Pl.'s Resp. SMF ¶ 38.
[10] Defs.' SMF ¶ 36; Pl.'s Resp. SMF ¶ 36.
[11] Defs.' SMF ¶ 1; Pl.'s Resp. SMF ¶ 1.
[12] Defs.' SMF ¶ 32; Pl.'s Resp. SMF ¶ 32.
[13] Defs.' SMF ¶ 41; Pl.'s Resp. SMF ¶ 41.
[14] Defs.' SMF ¶¶ 52, 54; Pl.'s Resp. SMF ¶¶ 52, 54.

feel welcome and safe in our schools."[15]  The article also quoted Stephen Wessler, the executive Director of the Center for the Prevention of Hate Violence, who was working with the middle school to develop an appropriate response to the April 11 incident.[16]

On April 23, 2007, an article by Nicholas Plagman appeared on a website called Associated Content.[17]  The article, apparently a parody,[18] purported to describe the April 11 incident with quotations from Levesque and Wessler, but some of the facts and quotations were fabricated.[19]  For example, the Plagman article reported that the ham was a "ham sandwich" and falsely quoted Levesque as saying "[t]hese children have got to learn that ham is not a toy, and that there are consequences for being nonchalant about where you put your sandwich."  The article also falsely quoted Levesque as saying that "[a]ll our students should feel welcome in our schools, knowing that they are safe from attacks with ham, bacon, porkchops, or any other delicious meat that comes from pigs."  The article attributed several fabricated quotations to Wessler, including:  "[The students] probably felt like they were back in Mogadishu starving and being shot at.  No

---

[15] Bonnie Washuk, <u>Hate Incident in City: One Suspended From School After Somalis Harassed With Ham</u>, Lewiston Sun Journal, April 19, 2007, at A1 (Ex. B to Decl. of Dori Ann Hanswirth ("Hanswirth Decl."), Docket Item 51-3).  The defendants quote portions of the Washuk article in their statement of material facts, ¶¶ 55, 57.  The plaintiff does not challenge these statements, <u>see</u> Pl.'s Resp. ¶¶ 55, 57.

[16] Washuk, <u>supra</u> n.15 (Ex. B to Hanswirth Decl.).  <u>See also</u> Defs.' SMF ¶¶ 49, 56; Pl.'s Resp. SMF ¶¶ 49, 56.

[17] Defs.' SMF ¶ 69; Pl.'s Resp. SMF ¶ 69.  According to the parties, "Associated Content is a media company that publishes written articles, videos, and audio content online at www.associatedcontent.com."  Defs.' SMF ¶ 70; Pl.'s Resp. SMF ¶ 70.

[18] Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Redacted) 2 (Docket Item 57); DVD copy of defendants' on-air retraction (Ex. B to Decl. of David Brown ("Brown Decl."), Docket Item 43).

[19] Pl.'s Resp. SMF ¶ 72; DVD copy of defendants' on-air retraction (Ex. B to Brown Decl.).

child, Muslim or normal, should have to endure touching a ham sandwich."[20]  The Plagman article falsely listed the Associated Press as a source.[21]

Fox & Friends is a daily morning show on the Fox News Channel, which is owned and operated by the defendant, Fox News Network, LLC.[22]  The hosts, two of whom are the individual defendants Steve Doocy and Brian Kilmeade, report and discuss news and current events, interview guests, and report the weather from 6 am until 9 am.[23]  Early in the morning of April 24 (about 3:30 am), a Fox & Friends producer searching the Internet for news reports discovered a link to the Plagman article.[24]  The producer sent the Plagman piece to the Fox News Research Department for further research.[25]  There, another Fox employee researched the incident described in the Plagman piece.  He confirmed some of the facts presented in the article.  For example, he confirmed that the Lewiston Middle School, the Lewiston School Department, and the Center for the Prevention of Hate Violence all existed.  He also confirmed that Levesque was the superintendent of the Lewiston School Department and that Wessler was the executive director of the Center for the Prevention of Hate Violence.  He discovered the Washuk article on the incident (and confirmed that the Lewiston Sun Journal

---

[20] Nicholas Plagman, <u>Student Leaves Ham Sandwich on Lunch Table Near Muslims, Suspended for Hate Crime: Somali Muslim Students Highly Offended, Scarred for Life</u> (Ex. A to Decl. of Maria Donovan ("Donovan Decl."), Docket Item 45-2).  <u>See also</u> Pl.'s Statement of Additional Material Facts (Redacted) ¶ 2 (Docket Item 58).

[21] Defs.' Mot. for Summ. J. 2 (Docket Item 39).  The statements of material facts do not explicitly establish that the Plagman piece *falsely* listed the Associated Press as a source.  However, the defendants acknowledge this point in their brief and the plaintiff does not dispute it.  The defendants' on-air retraction also acknowledged that the article was falsely sourced to the Associated Press.  <u>See</u> DVD copy of defendants' on-air retraction (Ex. B to Brown Decl.).

[22] Defs.' SMF ¶ 79; Pl.'s Resp. SMF ¶ 79; Brown Decl. ¶ 1.

[23] Defs.' SMF ¶ 81; Pl.'s Resp. SMF ¶ 81.

[24] Defs.' SMF ¶ 84; Pl.'s Resp. SMF ¶ 84.

was a legitimate newspaper) and two other articles relating to a prior incident in Lewiston in which a man rolled a pig's head into a local mosque.[26]

The Fox research employee sent the Washuk article and the two mosque incident articles to the producer who delivered them to Fox & Friends's senior producer.[27]   They were then packaged with other news articles describing unrelated reports, to be considered for inclusion in the morning's cablecast of Fox & Friends.[28]   By 4:15 am, approximately forty-five minutes after the producer's initial discovery of the Plagman parody, the materials had been delivered to the show's executive producer.[29]   They were also provided to the show's hosts, including the defendants Steve Doocy and Brian Kilmeade.[30]

After receiving the materials, Doocy conducted additional research through the search engine Google News.[31]   Doocy's Google News search revealed the Washuk article and the Plagman piece (both of which he already possessed) and a brief April 19, 2007, item published on the Boston Globe's website, www.boston.com.[32]  The Globe article corroborated the general story recounted in

---

[25] Defs.' SMF ¶ 88; Pl.'s Resp. SMF ¶ 88.

[26] Defs.' SMF ¶¶ 92-96; Pl.'s Resp. SMF ¶¶ 92-96.

[27] Defs.' SMF ¶¶ 98-99; Pl.'s Resp. SMF ¶¶ 98-99.

[28] Defs.' SMF ¶ 101; Pl.'s Resp. SMF ¶ 101.

[29] Defs.' SMF ¶ 101; Pl.'s Resp. SMF ¶ 101l; Brown Decl. ¶ 12.  The record suggests that the initial research may have been completed in about twenty minutes.  The producer states that she first discovered the Plagman article around 3:30 am.  Defs.' SMF ¶ 84; Pl.'s Resp. SMF ¶ 84.  Her request for additional research was created at 3:40 am, and the researcher's response, which included the Washuk article and the two mosque incident articles, was created at 3:49 am.  See Ex. A to Decl. of Matt Semble (Docket Item 49-2).

[30] Defs.' SMF ¶ 102; Pl.'s Resp. SMF ¶ 102.

[31] Defs.' SMF ¶ 108; Pl.'s Resp. ¶ 108.

[32] Defs.' SMF ¶ 113; Pl.'s Resp. SMF ¶ 113.  The defendants' statement of material facts states that Doocy also discovered an article published online by a Portland television station, Defs.' SMF ¶ 113, but the defendants failed to provide a copy of the article.  Doocy's declaration suggests that the article was probably about the earlier incident in which a man rolled a pig's head into a mosque, not about the middle school incident.  See Decl. of Steve Doocy ("Doocy Decl.") ¶ 14 *(continued on next page)*

6

the Washuk and Plagman pieces: it reported that a middle school student was suspended after he placed a ham steak in a bag on a lunch table where Somali students were sitting and that Superintendent Levesque said that the incident was being treated seriously and investigated by the police.   The Globe article also confirmed that the Center for the Prevention of Hate Violence was working with the school on a response plan.[33]   The article was sourced to the Associated Press.[34]   Doocy told the executive producer about the Globe article.[35]   Around 4:30 am, approximately one hour after uncovering the first reference to the April 11 incident (the Plagman parody), the defendants decided that they would include the story in that morning's show.[36]

At some point before the cablecast began at 6:00 am, the executive producer instructed a production assistant to contact Levesque and Wessler to arrange on-air interviews for that morning's show.[37]   The record indicates that the production assistant left two messages for Levesque sometime after 8:00 am on April 24, 2007.[38]   By that time, the show had been airing for over two hours.[39]   Levesque's assistant gave him the messages when he arrived at the office at 8:30 am.[40]   Levesque did not return the defendants' calls.[41]

---

(Docket Item 46).

[33] See boston.com, Police Investigate Ham Incident at School (Ex. A to Doocy Decl., Docket Item 46-2).   See also Defs.' SMF ¶ 113; Pl.'s Resp. SMF ¶ 113.

[34] Defs.' SMF ¶ 113; Pl.'s Resp. SMF ¶ 113.   It also referenced the Lewiston Sun Journal.   See boston.com, supra note 33 (Ex. A to Doocy Decl.).

[35] Defs.' SMF ¶ 114; Pl.'s Resp. SMF ¶ 114.

[36] Defs.' SMF ¶ 126; Pl.'s Resp. SMF ¶ 126.

[37] Defs.' SMF ¶ 127; Pl.'s Resp. SMF ¶ 127.

[38] Defs.' SMF ¶¶ 128-129; Pl.'s Resp. SMF ¶¶ 128-129.

[39] See Defs.' SMF ¶ 79; Pl's Resp. SMF ¶ 79.

[40] Defs.' SMF ¶ 130; Pl.'s Resp. SMF ¶ 130.

[41] Defs.' SMF ¶ 146; Pl.'s Resp. SMF ¶ 146.

During the course of the three-hour Fox & Friends cablecast, the defendants repeatedly raised and discussed the April 11 incident, relentlessly ridiculing Levesque and his handling of the episode.  They reported as true some of the quotations that Plagman falsely attributed to Levesque.  They also attributed to Levesque certain fabricated statements that the Plagman article had attributed to Wessler.[42]  The defendants also used the incident as the basis for their "question of the day," where the hosts ask viewers to call or email the show to share their thoughts.[43]  The question they posed was: "Ham sandwich, hate crime or just lunch?"  The defendants aired at least two phone calls with viewers who discussed the April 11 incident, and referred to several emails that they received on the subject during the cablecast.[44]

Sometime after the April 24, 2007, Fox & Friends cablecast, Levesque's lawyer contacted Fox News Channel to complain about inaccuracies in the cablecast.[45]  On May 16, 2007, Fox & Friends issued a retraction and apology, admitting that "various quotes [in the Plagman parody] were cited to Superintendent Leon Levesque that turned out to be fictitious" and that had Fox & Friends "known the source was not legit [it] never would have mentioned them."[46]

---

[42] See Transcript of cablecast (Ex. M to Hanswirth Decl., Docket Item 51-14).
[43] Defs.' SMF ¶¶ 134-135; Pl.'s Resp. SMF ¶¶ 134-135.
[44] Transcript of cablecast (Ex. M to Hanswirth Decl.).
[45] Defs.' SMF ¶ 163; Pl.'s Resp,. SMF ¶ 163.
[46] DVD copy of defendants' on-air retraction (Ex. B to Brown Decl.).  See also Defs.' SMF ¶ 165; Pl.'s Resp. SMF ¶ 165.

Levesque filed this lawsuit a few months later, asserting both defamation and false light invasion of privacy claims.[47]  The defendants have filed a motion for summary judgment.

ANALYSIS[48]

To make out his defamation claim, Levesque "must show that there has been publication to a third party of a false and defamatory statement."  Bakal v. Weare, 583 A.2d 1028, 1029 (Me. 1990).  Because Levesque has stipulated that he is a public official,[49] he must also show, by clear and convincing evidence, that the false and defamatory statement was made with actual malice: that the defendants either knew that the statement was false or acted with reckless disregard as to the truth or falsity of the statement.  New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 285-86 (1964); Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).

To prove false light invasion of privacy Levesque must prove (1) falsity; (2) that the false light in which he was placed would be highly offensive to a

---

[47] Pl.'s Compl. (Docket Item 1).  Levesque's complaint asserts a libel and a libel per se claim (in addition to the false light invasion of privacy claim).  The defendants object that he has not properly pleaded a libel claim because he has not alleged special damages.  Defs.' Mot. for Summ. J. 7 n.5.  Although some Maine Law Court cases imply that certain kinds of libel claims require that the plaintiff plead special damages, see, e.g., Lester v. Powers, 596 A.2d 65, 69 (Me. 1991) (singling out "professional reputation" as a type of libel that is "actionable at common law irrespective of actual damages," thereby suggesting that other libels may require special damages), others seem to embrace the rule that in libel cases generally, a plaintiff is not required to show special damages.  See, e.g., Powers v. Durgin-Snow Publ'g Co., 144 A.2d 294, 297 (Me. 1958); Briola v. J.P. Bass Publ'g Co., 25 A.2d 489, 490 (Me. 1942).  Because the parties agree that in order to prevail Levesque must meet the New York Times v. Sullivan "actual malice" standard of fault, and I conclude that Levesque has not met this burden, I do not need to resolve this dispute over the proper pleading of special damages.

[48] Subject matter jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332 and is not disputed.  Neither party suggests that New York law applies (where the defendants are located), and both parties cite Maine, First Circuit, and United States Supreme Court precedent.  I do not see any disagreement between the parties on choice of law.

[49] See Stipulation Regarding Pl.'s Status as a Public Official (Docket Item 17).

reasonable person; and (3) that the defendants had knowledge of or acted in reckless disregard as to the truth or falsity of the publicized matter.  Veilleux v. National Broadcasting Co., 206 F.3d 92, 134 (1st Cir. 2000).[50]

Thus, both claims require Levesque to prove that the defendants made false statements with knowledge or reckless disregard of their truth or falsity, and that the statements were either defamatory (defamation claim) or highly offensive (false light claim).

### (1)    *False statements of fact*

Only statements that are provable as false are actionable under defamation or false light invasion of privacy; the Constitution protects as "opinion" statements that do not "contain a provably false factual connotation."  Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990) (defamation); Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000) (defamation); Veilleux, 206 F.3d at 134 (false light).  Although some of the challenged statements (or portions of them) in the Fox & Friends cablecast may be protected as opinion,[51] Levesque has identified the following false statements of fact:[52]

---

[50] The parties do not discuss the publicity requirement of the false light invasion of privacy tort, but it is clearly satisfied by the cablecast on a national cable network.

[51] For example, the statement "I can understand that [rolling a pig's head into a mosque] as a hate crime.  But, for a kid to put a sandwich on a table, that is crazy." is at least partially protected.  "That is crazy" is rhetorical hyperbole, not a statement provable as either true or false.  See Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 130-31 (1st Cir. 1997) ("Certain excesses of language cannot ground a defamation claim because, *in context*, those excesses involve only puffery or epithets, and thus are insufficiently fact-based.  These turns of phrase are recognized rhetorical devices . . . ." (internal citations omitted) (emphasis in original)).  But the statement conveys at least one statement of fact: that the ham was in a sandwich.

[52] Levesque bears the burden of proving that the challenged statements are false.  See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775 (1986) (citing Garrison v. Louisiana, 379 U.S. 64, 74 (1964)); Ballard v. Wagner, 877 A.2d 1083, 1087 (Me. 2005).  Although he has not submitted a declaration expressly establishing that he did not make these two statements, the record reveals several admissions by the defendants.  Specifically, David Brown, the executive producer of Fox & *(continued on next page)*

- Two statements in which the defendants attribute false quotations to Levesque.  First, Doocy's statement: "Also, the superintendent, a fellow who we're gonna really try hard to get on our show tomorrow to explain all this stuff—Leon Levesque—he says, 'These children have got to learn that ham is not a toy.'"  Second, Kilmeade's statement: "[T]he superintendent, who looks as though he's going to the hilt with this,[53] says it's akin to making these kids feel like they're being shot at back in Mogadishu and being starved to death."[54]

---

Friends, admitted that after the cablecast, the defendants learned that "the quotes that [they] attributed to [Levesque] were not his," and that they were, in fact, fabricated.  See Deposition of David Brown, 96:25-98:14, Nov. 29, 2007 (Ex. C to Kubetz Aff., Docket Item 64).  This admission is imputed to defendant Fox News Network, LLC.  Moreover, in the May 16, 2007 on-air Fox & Friends retraction, Doocy admitted, "In [the Plagman] parody various quotes were cited to Superintendent Leon Levesque that turned out to be fictitious.  Had we known the source was not legit we never would have mentioned them.  We apologize if we offended Superintendent Levesque and the Lewiston school system."  DVD copy of defendants' on-air retraction (Ex. B to Brown Decl.).  This is an admission by Doocy individually and on behalf of Fox News Network, LLC that the quotations attributed to Levesque were false.  In his deposition, Doocy also admitted that "the Plagman quotes were inaccurate" and "[t]he quotes [were] wrong."  Deposition of Steve Doocy, 144:14, 145:15, Nov. 28, 2007 (Ex. A to Kubetz Aff., Docket Item 63).

[53] The portion of the statement in which Kilmeade characterizes Levesque as "going to the hilt with this" is not actionable.

[54] The statement "[T]he superintendent and the school board [are] looking into perhaps other charges against the kid because it's a hate crime." is not actionable because it is substantially true.  See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17 (1991).  Under Maine law, the challenged statement must be read in context and "construed in the light of what might reasonably have been understood therefrom by the persons who [heard] it.  In interpreting the language, it is . . . a question of . . . the natural and probable effect of the words upon [the listener]."  Marston v. Newavom, 629 A.2d 587, 592 (Me. 1993).  According to the Washuk article, Levesque said "more disciplinary action could follow a possible hate crime at Lewiston Middle School."  Levesque does not challenge the accuracy of this quotation.  In the context of the entire story, a jury could not conclude that the challenged statement implied that Levesque considered pursuing *criminal* charges against the student.  It is general knowledge that school superintendents are not prosecutors.  The statement "[T]he Center for Prevention of Hate Violence in that region says they are now working with the school to create an anti-ham response plan.  We are not making this up." is also not actionable.  Levesque does not deny that the school was working with the Center for the Prevention of Hate Violence to develop a response plan; that part of the statement is true.  He objects to the use of the term "anti-ham response plan," Pl.'s Opp'n to Defs.' Mot. for Summ. J. 10, but that characterization is rhetorical hyperbole, protected by the First Amendment.  See Levinsky's, 127 F.3d at 130-31.

- Statements characterizing the ham as a ham sandwich.[55]

**(2)    *Defamatory in nature***

Under Maine law, a statement "is defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" Bakal, 583 A.3d at 1029 (quoting Restatement (Second) of Torts § 559 (1977)). The statement must be read in context, id. at 1030, and must be "construed in the light of what might reasonably have been understood therefrom by the persons who [heard] it." Veilleux, 206 F.3d at 108 (quoting Marston, 629 A.2d at 592).    A statement is defamatory if it "naturally tend[s] to expose the plaintiff to public hatred, contempt or ridicule . . . ." Brown v. Guy Gannett Publ'g Co., 82 A.2d 797, 798 (Me. 1951).

Ridicule includes "[t]he act or practice of exciting laughter at a person or thing by means of jesting words, caricature, mocking, etc.; remarks, etc. intended to show one in an amusing or absurd light; slightly contemptuous banter . . . ." Powers, 144 A.2d at 296 (liability against publisher where article "naturally tended to

---

[55] The record does not reveal definitively the precise nature of the ham that the student placed on the cafeteria table.  The parties acknowledge that "[a]t various times during discovery, the meat at issue . . . has been described as: 'ham,' 'honey of a ham,' 'leftover ham,' 'leftover Easter ham,' a 'ham bone I supposed,' a 'ham roast,' a 'ham steak,' and a 'piece of ham.'"  Defs.' SMF ¶ 19; Pl.'s Resp. SMF ¶ 19.  But nobody described it as a ham sandwich.  Although the defendants' statement of material facts and Levesque's response assert that the middle school principal did not see the ham that was used in the incident, see Defs.' SMF ¶ 25; Pl.'s SMF ¶ 25, the defendants' brief in support of their motion for summary judgment reveals that she did see the ham.  Defs.' Mot. for Summ. J. 11.  Her deposition testimony reflects the same.  She described the ham as "probably a half a ham with parts of it eaten as it was a leftover ham from Easter."  Dep. of Maureen Lachapelle, 43:12-13, Nov. 13, 2007 (Ex. G to Hanswirth Decl., Docket Item 51-8).  The defendants admit that the Plagman article was the only article they produced that described the object as a ham sandwich.  Pl.'s Statement of Additional Material Facts ¶ 3; Defs.' Reply Statement of Material Facts (Redacted) ¶ 3 (Docket Item 77).

expose the plaintiff to laughter tinged with contempt, or in other words to ridicule").

Here, the defendants caricatured Levesque mercilessly for allegedly overreacting to a student prank.  They reported falsely both his reaction and the nature of the "prank."  The following are two representative exchanges among the hosts:[56]

> DOOCY: [T]his is the number 1 story that we've been talking about today.  Up in Maine, a middle school kid—you know middle school kids
> KILMEADE: 7th grade was it?
> DOOCY: when they're not saying pull my finger they're doing crazy stuff.  He left a ham sandwich in a paper bag where some kids from Somalia would have their lunches.  The kid has been suspended and they're calling it a hate crime.
> BREAK
> DOOCY: We're gonna do a recreation, alright?
> CARLSON: Ok.
> DOOCY:  Let . . . Brian,  just  for  uh . . . demonstrative purposes, hi, how are you Alisyn?
> CAMEROTA: Oh, hello.
> DOOCY: Great.  Uh . . . Alisyn, let's pretend, this is a ham sandwich, let's pretend that uh . . . Brian is uh . . . from Somalia, alright?  And I'm . . .
> CAMEROTA: [OVERLAPPING] That's quite a stretch.
> DOOCY: And I'm in . . . yeah, I'm in middle school and I know that he's from Somalia, and I've got this ham sandwich, and I just put it on a table next to him . . .
> KILMEADE: Right.
> DOOCY: Just like that.
> KILMEADE: Right.
> CAMEROTA: And then you come back here and you and I giggle.
> DOOCY: That's right.  I put a ham sandwich next to him.
> CAMEROTA: That's funny.
> KILMEADE: But of course I didn't know what was in it so it would have to be covered.
> DOOCY: That's right.

---

[56] The speakers are hosts Steve Doocy, Brian Kilmeade, Alisyn Camerota, and Gretchen Carlson.  I include these two excerpts, one of which is fairly long, because the caselaw instructs me to consider the allegedly defamatory statements in context.  The dialogue is reproduced from a transcript of the cablecast that the defendants submitted.  See Tr. of cablecast (Ex. M to Hanswirth Decl.).  The ellipses and grammatical errors are in the original.

KILMEADE: And then I realize it's ham.

CAMEROTA: Right.

KILMEADE: And suddenly . . .

CARLSON: And so you give it to me. [LAUGHS] Thank you.  I'll eat it all for you, Thank you, cause you can't touch ham.

KILMEADE: Yeah, look out.

DOOCY: I should have put it in front of her.

CARLSON: Yeah, is that how it ended?

DOOCY: So anyway, yeah, this is what happened in Lewiston, Maine where a middle school kid being funny doing a joke put a ham sandwich in a paper bag in front of, on a table, where some Muslim students would sit.  Well now that kid is being investigated for possible hate crimes.   He's been uh . . . suspended and the superintendent and the school board looking into perhaps other charges against the kid because it's a hate crime.

KILMEADE: Yeah . . . yeah evidently these Somalia kids are Muslim and Muslims think pork is unclean and highly offensive uh . . . and they feel as though to put that in front of somebody is akin to trauma . . . uh . . . to a hate crime.  It's traumatizing   and   in   this   case   in   particular   the superintendent, who looks as though he's gonna go to the hilt with this, says it's akin to making these kids feel like they're being shot at back in Mogadishu and being starved to death.

DOOCY: Brian, the Center for Prevention of Hate Violence in that region says they are now working with the school to create an anti-ham response plan.  We are not making this up. Also the superintendent, a fellow who we're gonna really try hard to get on our show tomorrow to explain all this stuff, Leon Levesque, he says quote, these children have got to learn that ham is not a toy.  Uh . . . so they sa . . . you know what this is . . . this is crazy . . .

CARLSON: [OVERLAPPING] I do think this is going way too far.

DOOCY [OVERLAPPING]: Hello!

Considered as a whole, the tenor of the Fox & Friends cablecast and the use

of the false statements "exposed the plaintiff to laughter tinged with contempt."

Powers, 144 A.2d at 296.  The defendants, who believed that they had found a

"story that was over the top, political correctness gone amuck,"[57] emphasized the

details   that   seemed   particularly   ridiculous—the   ham   sandwich,   the   absurd

---

[57] Deposition of executive producer David Brown 130:20-21 (Ex. C to Kubetz Aff.); Pl.'s Statement of Additional Material Facts ¶ 6.  The plaintiff's statement of facts paraphrases Brown's deposition *(continued on next page)*

14

quotations.    A  reasonable  jury  would  certainly  grasp  the  ridicule  in  the

defendants' portrayal of the incident and could conclude that the false statements

were defamatory.[58]

### (3)    *Actual Malice*

Through sworn declarations, the defendants state that they did not know

that their statements about Levesque were false.[59]  Levesque does not seriously

dispute this point.  Instead, he argues that the defendants "expressed doubts" on

the air as to the accuracy or veracity of the statements they reported.[60]  So the

real issue is whether the defendants acted with reckless disregard of the truth.

That inquiry is subjective, focusing on the defendants' state of mind.  To find that

---

testimony.  The quoted language is what appears at the cited page of the deposition transcript.

[58] Levesque has also raised a genuine issue of material fact on the "highly offensive to a reasonable person" element of the Maine false light cause of action.  Veilleux, 206 F.3d at 134.  Maine has adopted the Restatement (Second) of Torts' requirements for a false light invasion of privacy claim. See Cole v. Chandler, 752 A.2d 1189, 1197 (Me. 2000) (quoting Restatement (Second) of Torts § 652E (1977)).  The Restatement elaborates that "[i]t is only when there is such a major misrepresentation of [the plaintiff's] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in [the plaintiff's] position, that there is a cause of action for invasion of privacy."  Restatement (Second) of Torts § 652E comment c.  A question of fact exists as to whether the portrayal of Levesque—in a television *news* show, not in a humor publication—was highly offensive to a reasonable person.  A jury could find that a reasonable person subjected to the mockery to which the defendants subjected Levesque would take serious offense.

[59] For Kilmeade, see Defs.' SMF ¶ 107.  Levesque attempts to deny this assertion, Pl.'s Resp. SMF ¶ 107, but his only support for the denial is Kilmeade's on-air comments, through which, Levesque claims, Kilmeade "expressed doubts over the accuracy" of the report.  I conclude *infra* that these on-air comments do not refute Kilmeade's sworn statement of belief.  For Fox News Network, LLC, see Defs.' SMF ¶ 139.  Levesque attempts to deny this statement, Pl.'s Resp. ¶ 139, but the support for his denial is not responsive to the assertion--the fact that the Plagman article was the only article that referred to the ham as a ham sandwich does not refute the executive producer's declaration that he believed the Fox & Friends report was accurate.  For Doocy, see Defs.' SMF ¶ 140.  Levesque attempts to deny this assertion, Pl.'s Resp. ¶ 140, but his support for the denial does not refute Doocy's sworn statement of belief.  First, Levesque cites Doocy's on-air comments, which he considers expressions of doubt as to the veracity of the report.  I conclude *infra* that Doocy's on-air comments are consistent with his sworn statement.  Second, Levesque asserts that Doocy's research did not corroborate the quotes that Plagman attributed to him.  Even if I accept this statement as true, it does not contradict Doocy's declaration that he believed the Fox & Friends report was accurate.

[60] See, e.g., Pl.'s Response SMF ¶¶ 107, 117.

the defendants acted with actual malice, "[t]here must be sufficient evidence to permit the conclusion that [they] in fact entertained serious doubts as to the truth of [their] publication," St. Amant v. Thompson, 390 U.S. 727, 731 (1968), or that they "made the false publication with a 'high degree of awareness of . . . probable falsity.'"   Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 667 (quoting Garrison, 379 U.S. at 74).

The record reveals that the defendants ran this story after conducting very limited research.  At 3:30 am, a producer found the Plagman parody, a story that was (falsely) sourced to the Associated Press, and sent it to a colleague requesting confirmation.  None of the defendants was familiar with the author or the website on which it was published.[61]  Nothing about the story was time-sensitive; the event was already two weeks old.  Between 3:30 am and 4:30 am, the defendants uncovered two additional articles relating to the incident at Lewiston Middle School from sources that they could confirm were legitimate (the Lewiston Sun Journal and www.boston.com).  But neither the Washuk article nor the www.boston.com piece repeated the outrageous quotations of the Plagman parody. At 4:30 am, the defendants decided to air the story on that morning's show, which began at 6:00 am.  For the outrageous quotations, they relied solely on what they found in the Plagman piece on the Internet.[62]  According to Levesque's expert witness, relying on the Internet is not a "common method of news gathering."[63]

---

[61] Pl.'s Statement of Additional Material Facts ¶ 5 (Docket Item 62); Defs.' Reply SMF ¶ 5 (Docket Item 78).

[62] Defs.' SMF ¶¶ 84-125.  Although Levesque disagrees with some of the assertions contained in these paragraphs, he does not suggest that the defendants consulted other sources.

[63] Ureneck Dep. 21:19-20, Jan. 11, 2008 (Docket Item 38-3).

But because the <u>New York Times v. Sullivan</u> standard focuses on the defendant's actual state of mind with regard to the truth or falsity of the published statements, not on what the reasonably prudent reporter would have published or investigated, <u>see</u> <u>St. Amant</u>, 390 U.S. at 731, this testimony respecting common practice and industry standards is not relevant.  "[A] public figure plaintiff must prove more than an extreme departure from professional standards . . . ." <u>Connaughton</u>, 491 U.S. at 665.

The defendants were certainly gullible.  Even if they believed the segments of Plagman that they repeated on the air, at least two portions of the Plagman piece were so absurd that they should have raised the defendants' truth-seeking antennae and caused them to question the accuracy of the article as a whole. First, Plagman "quotes" Levesque as saying "All our students should feel welcome in our schools, knowing that they are *safe from attacks with ham, bacon, porkchops, or any other delicious meat that comes from pigs.*" (emphasis added).[64] Later, he "quotes" a student as saying "I'm just glad that kid I beat up yesterday was white; I wouldn't want to be in that mess."[65]  If negligence as to the reliability of a source were the standard, this should be enough.  One would hope that when a publisher is poised to report outrageous quotations from such a source, for a story that is not even breaking news, the publisher's failure to confirm the accuracy of the quotations demonstrates "an extreme departure from professional

---

[64] Plagman, <u>supra</u> n.20 (Ex. A to Donovan Decl.).  The first half of this quotation ("All our students should feel welcome in our schools") was published in the Washuk article, but that article did not include the second half of the sentence.  <u>See</u> Washuk, <u>supra</u> n.15 (Ex. B to Hanswirth Decl.).

[65] Plagman, <u>supra</u> n.20 (Ex. A to Donovan Decl.).  It is interesting that during their cablecast, the defendants did not repeat either of these statements, perhaps the most absurd and ridiculous of *(continued on next page)*

standards." <u>Connaughton</u>, 491 U.S. at 665.[66]  But unprofessional conduct does not amount to reckless disregard of the truth, and "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." <u>Id</u>. at 688.

In light of the evidence in the record a reasonable jury could not find that the defendants acted with reckless disregard of the truth—that they entertained serious doubts as to the truth or had a high degree of awareness of probable falsity.  <u>See</u> <u>St. Amant</u>, 390 U.S. at 731; <u>Connaughton</u>, 491 U.S. at 667.  The defendants' research uncovered the Washuk article from the Lewiston Sun Journal and a short piece on www.boston.com and confirmed several facts presented in the Plagman piece: the general nature of the event; that Superintendent Levesque was involved in responding to the incident; that Wessler and the Center for the Prevention of Hate Violence existed and were working with the school in the aftermath of the incident; and that the story had been reported in a reputable local newspaper.  Doocy testified that when he conducted additional research on the story, he found a link to the Plagman piece through the search engine Google News, which he believed to be a useful and reliable tool that

---

the quotations.  But the parties do not address this point so neither will I.

[66] "A journalist tries to tell the literal truth and get the facts right, does not pass along rumors, engages in verifying, and makes that verification process as transparent as possible.  A journalist's goal is to inspire public discussion, not to help one side win or lose. . . . Neutrality is not a core principle of journalism.   But the commitment to facts, to public consideration, and to independence from faction, is." Tom Rosenstiel, <u>Who's a Journalist?  Take Notes: You Might Be Surprised</u>, boston.com, July 26, 2004, http://www.boston.com/news/nation/articles/ 2004/ 07/26/whos_a_journalist_take_notes_you_might_be_surprised/.  Tom Rosenstiel, a journalist for more than twenty years, is the Director of the Project for Excellence in Journalism, a project of the Pew Research Center.   <u>See</u> Project for Excellence in Journalism (PEJ), People of PEJ, http://www.journalism.org/about_pej/staff.

"searches only bona fide news outlets."[67]   The actual malice standard is a subjective standard.   What matters is not whether Doocy's belief about Google News was accurate but whether he truly held the belief, and nothing in the record undermines his assertion on that point.[68]

Levesque argues that Doocy and Kilmeade's on-air expressions reveal that, in fact, they doubted the truth of the information they reported.   He says that Kilmeade "directly expressed his doubts as to the veracity of the Challenged Statements" when he said, "You know, I hope we're not being duped."[69]  Levesque further argues that Kilmeade's reference to the satirical newspaper The Onion ("I thought this was almost from The Onion.") implied that Kilmeade thought the story was fabricated.[70]  With respect to Doocy, Levesque argues that a jury could reasonably infer that Doocy "entertained serious doubts as to the veracity of the quotes" because during the cablecast he repeatedly said "I'm not making this up," and he referred to the quotations as "extraordinary stuff."[71]

---

[67] Defs.' SMF ¶ 109.  Levesque's response, Pls.' Resp. SMF ¶ 109, disputes the manner in which Google operates but does not dispute that Doocy believed that Google searches only bona fide news outlets.

[68] Similarly, Doocy believed that the Plagman piece was an Associated Press article because it was sourced to the Associated Press.  Defs.' SMF ¶ 119; Pl.'s Resp. SMF ¶ 119.  The fact that the article was *falsely* sourced to the Associated Press does not diminish the force of Doocy's statement about his belief.

[69] Pl.'s Opp'n to Defs.' Mot. for Summ. J. 18.

[70] Id. at 17.

[71] Id. at 18.  Levesque also points out that during the cablecast, Doocy reassured his colleagues that they were "not being duped" and that he "looked it up on a couple of different websites up there from local papers."  Id. at 16.  It is true that the local sources Doocy reviewed did not corroborate the outrageous quotations that the defendants gleefully reported (although they did corroborate the general facts of the incident).  But even if it were proper to read Doocy's statement as asserting that he had corroborated the outrageous quotations specifically, this false statement is surely not defamatory.  See Gautschi v. Maisel, 565 A.2d 1009, 1011-12 (Me. 1989) ("[The plaintiff] had to produce evidence that [the defendant] knew the *slanderous element* of his statement was false (or recklessly disregarded its truth or falsity)." (emphasis added)).

A reasonable jury could not find clear and convincing evidence of actual malice based on these comments. First, Doocy's comments convey that despite how surprising and over-the-top the story was, he believed it. Doocy's on-air assertion, "I'm not making this up," is consistent with his sworn declaration that he "believed that [the Plagman piece's] contents were accurate and reliable."[72] There is no contradictory evidence.

Kilmeade's comments are comparable. The statement "I thought this was almost from The Onion" suggests that he found the story of the incident so "unbelievable" that it was the kind of story he expected to see in a humor publication. But he used the past tense ("I thought") and qualified the statement with "almost." Kilmeade has sworn that at the time of the Fox & Friends cablecast, he did not think the story was from The Onion; he believed it to be truthful and accurate.[73] There is no contradictory evidence. The record reveals that in addition to the Plagman piece, Kilmeade received the Washuk article, which corroborated the basic facts presented in Plagman. He did not do any independent research on the story, and there is no indication that he possessed any information that contradicted the facts recited by Plagman. "I hope we're not being duped" does not mean "I seriously doubt the accuracy of this report." At most, Kilmeade's comments show a fleeting concern, in light of the

---

[72] Defs.' SMF ¶ 121. Levesque attempts to deny this assertion, Pl.'s Resp. SMF ¶ 121, but his only support for the denial is Doocy's on-air comments, which I conclude are consistent with the sworn statement.

[73] Defs.' SMF ¶¶ 107, 137; Kilmeade Decl. ¶ 12. Levesque attempts to deny Kilmeade's assertion that be believed the Fox & Friends report was accurate, Pl.'s Resp. SMF ¶¶ 107, 137, but his only support for the denial is Kilmeade's on-air comments, which I conclude do not refute Kilmeade's sworn statement of belief.

outrageousness of the story, that the defendants might later learn that what they believed to be true was not entirely accurate.  A reasonable jury could not find with convincing clarity, see New York Times Co., 376 U.S. at 285-86, that Kilmeade entertained "serious doubts" as to the truth.

### CONCLUSION

The defendants reported accurately that there was an incident at Lewiston Middle school in which one student intentionally placed ham in front of Somali students eating lunch; that the student was suspended; and that Levesque took the incident very seriously and supported the school's disciplinary action.  The inaccuracies in the defendants' coverage lay in characterizing the ham as a "ham sandwich," inserting innocuousness into the student's behavior, and attributing outrageous, false quotations to Levesque.  The defendants used both the quotations and the ham sandwich to portray Levesque falsely as too politically correct, with an "over-the-top" response to a middle school prank.  Their failure to conduct further research (this was not breaking news; there were no time constraints) or to question the reliability of the Plagman piece was a "negligent failure to connect the dots," see Howard v. Antilla, 294 F.3d 244, 255 (1st Cir. 2002), and, one would hope, an "extreme departure from professional standards." Connaughton, 491 U.S. at 665.  But that is not enough to satisfy the actual malice standard.  The First Amendment protects journalists even when they are gullible.

21

The defendants' motion for summary judgment is **GRANTED**.[74]

**SO ORDERED.**

**DATED THIS 3RD DAY OF JUNE, 2008**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[74] The defendants' motion to exclude testimony of the plaintiff's expert witness is moot.  See Defs.' Mot. to Exclude (Docket Item 37).  Levesque's motion in limine to admit evidence of various email and telephone messages is also moot.  See Pl.'s Mot. in Limine to Admit Certain Evidence (Docket Item 98).